**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**ADRIAN JUAREZ ORTIZ** et al., on
behalf of himself and all others similarly
situated,

Plaintiffs,

v.

**GERDAU AMERISTEEL US, INC**.
and **GERDAU MACSTEEL, INC**.,

Defendants.

Case No. 3:24-cv-00572-S

HON. KAREN GREN SCHOLER

**PLAINTIFFS' UNOPPOSED MOTION FOR APPROVAL OF COLLECTIVE ACTION
SETTLEMENT AND NOTICE OF COLLECTIVE ACTION SETTLEMENT**

## TABLE OF AUTHORITIES

### CASES

*Bodle v. TXL Mortg. Corp.*, 788 F.3d 159, 163 (5th Cir. 2015) ................................................... 21

*Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255 (2017) ................................................ 23

*Bryant v. United Furniture Indus.*, 2017 U.S. Dist. LEXIS 22280 (N.D. Miss. Feb. 16, 2017) .. 42

*Cal. Fed. Sav. 13 & Loan Ass'n v. Guerra*, 479 U.S. 272, 279, n.10, 290 (1987) .............. 8, 9, 22

*Camp v. Progressive Corp.*, 2004 U.S. Dist. LEXIS 19172 (E.D. La. Sept. 23, 2004) .............. 42

*Chavkin v. Santaella,* 81 A.D.2d 153, 157-58 (N.Y. App. Div. 1981) .......................................... 8

*Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ......................................................... 20, 31

*D'Angelo v. Hunter Bus. Sch., Inc.*, 2023 U.S. Dist. LEXIS 12344 (E.D.N.Y Jan. 24, 2023) ..... 39

*Diaz v. Panhandle Maint., LLC*, 2020 U.S. Dist. LEXIS 21482 (N.D. Tex. Feb. 6, 2020)
................................................................................................................ ……...20, 21, 24

*Duncan v. JPMorgan Chase Bank, N.A.*, 2016 U.S. Dist. LEXIS 122663 (W.D. Tex. May 24,
2016) ..................................................................................................................... 42

*Dyson v. Stuart Petroleum Testers, Inc.*, 2016 U.S. Dist. LEXIS 24190 (W.D. Tex. Feb. 29,
2016) ..................................................................................................................... 24

*Evans v. Greenlaw*, 2018 U.S. Dist. LEXIS 80569 (N.D. Tex. May 14, 2018) ......................... 27

*Fischer v. Fed. Express Corp.*, 42 F.4th 366, 385 (3d Cir. 2022) ................................................ 23

*Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) .................................................. 19

*Guadalupe v. Am. Campus Communities Services, Inc.*, 2020 U.S. Dist. LEXIS 259660 ........... 41

*Guerrero v. United States Gypsum Co.*, 2022 U.S. Dist. LEXIS 233930 (S.D. Cal. Dec. 30, 2022)
............................................................................................................................ 39

*Herster v. Bd. of Supervisors of La. State Univ.*, 2013 U.S. Dist. LEXIS 77737 (M.D. La. June 3,
2013) ..................................................................................................................... 19

*In re Bayou Sorrel Class Action*, 2006 U.S. Dist. LEXIS 80924 (W.D. La. Oct. 31, 2006) ........ 33

*In re Combustion, Inc.*, 968 F. Supp. 1116, 1134 (W.D. La. 1997) ...................................... 33, 34

*In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 449 (S.D. Tex. 1999) ....................................... 42

*In re Prudential-Bache Energy Income Partnerships Sec. Litig.*, 1994 U.S. Dist. LEXIS 4786 (E.D. La. Apr. 14, 1994) ................................................................... 34

*Izzio v. Century Golf Partners Management*, 2019 U.S. Dist. LEXIS 226946 (N.D. Tex. Feb. 13, 2019)................................................................................................ 41

*Jasso v. HC Carriers, LLC*, 2022 U.S. Dist. LEXIS 207043 (S.D. Tex. Oct. 19, 2022)........ 19, 39

*Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714, 717-20 (5th Cir. 1974) ................................ 34

*Johnson v. Gerdau Macsteel, Inc.*, Case No. 23-CV-10719-BAF-CI (E.D. Mich.) .............. *passim*

*Johnson v. Univ. of Iowa*, 431 F.3d 325, 328 (8th Cir. 2005) ........................................................ 8

*Jones v. JGC Dallas LLC*, 2014 U.S. Dist. LEXIS 177472 (N.D. Tex. Nov. 12, 2014) ....... *passim*

*Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) ....................................... *passim*

*Knussman v. Maryland*, 272 F.3d 625, 636 (4th Cir. 2001) ........................................................... 8

*Lea v. Baker Hughes, Inc.*, 2015 U.S. Dist. LEXIS 183797 (S.D. Tex. Aug. 4, 2015) ................ 41

*Lee v. Metrocare Services*, 2015 U.S. Dist. LEXIS 194001 (N.D. Tex. July 1, 2015) ......... *passim*

*Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982)........... 20, 21, 24

*Martin v. Spring Break '83 Prods., LLC*, 688 F.3d 247, 255-56 (5th Cir. 2012) ......................... 21

*Nevada Department of Human Resources v. Hibbs,* 538 U.S. 721, 731 (2003)...................... 7, 22

*Newport News Shipbuilding Co. v. EEOC*, 462 U.S. 669, 683 (1983) .......................................... 8

*Osman v. Grube, Inc.*, 2018 U.S. Dist. LEXIS 78222 (N.D. Ohio May 4, 2018) ........................ 19

*Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982) .......................................................... 24

*Rotondo v. JPMorgan Chase Bank, N.A.*, 2019 U.S. Dist. LEXIS 201616 (S.D. Ohio Nov. 20, 2019)................................................................................................. 7, 8

*Schaefer v. Tannian*, 1995 U.S. Dist. LEXIS 11816 (E.D. Mich. Apr. 17, 1995)....................... 26

*Schafer v. Board of Public Education of the School District of Pittsburgh,* 903 F.2d 243, 248 (3d Cir. 1990) ................................................................................. 7, 22

*Schwartz v. TXU Corp.*, 2005 U.S. Dist. LEXIS 27077 (N.D. Tex. Nov. 8, 2005)..................... 27

*Shaw v. CAS, Inc.*, 2018 U.S. Dist. LEXIS 136394 (S.D. Tex. Jan. 21, 2018) ..................... 38, 41

*Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 973 (E.D. Tex. 2000) ....................... 42

*Singer v. City of Waco*, 324 F.3d 813, 829 (5th Cir. 2003) ......................................................... 36

*Smith v. M-I, LLC*, 2019 U.S. Dist. LEXIS 114596 (W.D. Tex. Feb. 26, 2019) ......................... 25

*Stanley v. Patriot Inspection Servs.*, 2021 U.S. Dist. LEXIS 14028 (W.D. Tex. Jan. 26, 2021) . 20

*Sved v. Chadwick*, 783 F. Supp. 2d 851, 861 (N.D. Tex. 2009) ............................................. 27, 28

*Tharp v. Energes LLC*, 2018 U.S. Dist. LEXIS 237660 (W.D. Tex. July 16, 2018) ................... 25

*Union Asset Mgmt. v. Dell, Inc.*, 669 F.3d 632, 643-44, n.34 (5th Cir. 2012)............................. 33

*Vassallo v. Goodman Networks, Inc.*, 2016 U.S. Dist. LEXIS 142379 (E.D. Tex. Oct. 13, 2016) ................................................................................................................................................. 26

*Villeda v. Landry's Rests., Inc.*, 2009 U.S. Dist. LEXIS 93480 (S.D. Tex. Oct. 7, 2009) ........... 20

*Welsh v. Navy Fed. Credit Union*, 2018 U.S. Dist. LEXIS 227456 (W.D. Tex. Aug. 20, 2018). 41

*Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982)............................................ 19

## STATUTES

29 U.S.C. § 216(b) .................................................................................................................. *passim*

29 U.S.C. § 255...................................................................................................................... 24

29 U.S.C. § 206...................................................................................................................... *passim*

42 U.S.C. section 2000e-2, *et seq.* .................................................................................. 1, 4, 16, 22

## OTHER AUTHORITIES

Theodore Eisenberg & Geoffrey P. Miller, *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 1, 37-38 (2004) .................................................. 33

U.S. Equal Emp. Opportunity Comm'n, No. 915.002, *Enforcement Guidance: Unlawful Disparate Treatment of Workers with Caregiving Responsibilities* (2007)............................. 9

U.S. Equal Emp. Opportunity Comm'n, No. 915.003, *EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues*, § I.C.3 (June 25, 2015) ................................ 9

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ..................................... 4

    A.   Plaintiffs' Background and Defendant's Parental Leave Policy ......................... 4

    B.   Plaintiffs' Tolling Agreement ........................................................................... 4

    C.   Settlement Negotiations and Modification to Ameristeel's Parental Leave Policy ........... 5

    D.   The Legal Claims Underlying Plaintiffs' Collective Action Lawsuit ................ 6

III.    SUMMARY OF THE SETTLEMENT TERMS ....................................... 10

    A.   The Potential Ameristeel EPA Collective Action Members and Participating Ameristeel EPA Opt-In Members ........... 10

    B.   Policy Change .................................................................................................. 12

    C.   The Gross Settlement Amount ........................................................................ 12

    D.   The Notice and Opt-In Process for Potential Ameristeel EPA Collective Action Members to Receive Individual Settlement Payments ........... 14

    E.   Releases .......................................................................................................... 16

    F.   Individual Settlement Payments to Participating Ameristeel EPA Opt-In Members ....... 16

    G.   Attorneys' Fees, Litigation Expenses, and Plaintiffs' General Release Payments ........... 17

    H.   Claims Administrator ...................................................................................... 18

IV.    COLLECTIVE ACTION SETTLEMENT PROCEDURE ....................... 18

V.    APPROVAL OF THE SETTLEMENT IS APPROPRIATE ..................... 20

    A.   The Settlement Represents a Compromise of a Bona Fide Dispute ................ 21

    B.   The Settlement is Fair and Reasonable ........................................................... 24

    C.   The Proposed Attorneys' Fees and Costs to Plaintiffs' Counsel are Fair and Reasonable 32

    D.   The General Release Payments to the Named Plaintiffs are Fair and Reasonable .......... 37

VI.    CONCLUSION ............................................................................................. 43

## I.      INTRODUCTION

Plaintiffs Adrian Juarez Ortiz ("Plaintiff Ortiz") and William Phillips ("Plaintiff Phillips") (together, "Plaintiffs"), individually and on behalf of all others similarly situated, have agreed to settle this Equal Pay Act ("EPA") collective action with Defendants Gerdau Ameristeel US, Inc. ("Ameristeel") and Gerdau Macsteel, Inc. ("Macsteel") (collectively "Defendants") (together with Plaintiffs, the "Parties"), in which Plaintiffs allege that Ameristeel and Macsteel discriminated against numerous non-union birth fathers employed by Ameristeel and Macsteel in violation of federal law in its provision of paid parental leave.[1] The Collective Action Settlement, which provides monetary relief to the Plaintiffs and Participating Ameristeel EPA Opt-In Members and Participating Macsteel EPA Opt-In Members, is fair, adequate, and reasonable, and was reached through arm's-length negotiations facilitated by experienced mediator Dina Jansenson, Esq.[2]

---

[1] By way of background, this case is a follow up case to a previous lawsuit against Defendant Macsteel, which alleged class claims Michigan-based male employees for violations of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. section 2000e-2, *et seq*.) based on the same theory as the instant case, which the parties agreed to settle and which received final approval in the Eastern District of Michigan. *See Johnson v. Gerdau Macsteel, Inc.*, Case No. 23-CV-10719-BAF-CI, Order Granting Plaintiffs' Unopposed Motions for Final Approval of Class Action Settlement, ECF No. 15 (E.D. Mich. Feb. 29, 2024) (hereinafter "*Johnson* action"). Following the Macsteel mediated class settlement, Plaintiffs' counsel was retained by Plaintiff Phillips on February 17, 2023 and by Plaintiff Ortiz on April 28, 2023 and circulated a draft nationwide Equal Pay Act complaint to Defendants' counsel on June 6, 2023 including nationwide Equal Pay Act collective action claims. Thereafter, the Parties entered into a tolling agreement on June 7, 2023 to toll Plaintiffs' nationwide Ameristeel Equal Pay Act collective action claims from June 7, 2023 for 150 days and agreed to attempt to resolve Plaintiffs' nationwide Equal Pay Act claims through pre-suit, private mediation after an exchange of informal discovery. In informal discovery, Defendants' counsel provided, among other things, Ameristeel's maternity leave policy and spreadsheets showing lists of its employees whose spouse gave birth to a child between April 21, 2020 and January 1, 2023 and/or requested FMLA leave related to pregnancy/childbirth/ and/or child bonding. On October 10, 2023, the Parties attended a private mediation where the Parties agreed to resolve Plaintiffs' nationwide Equal Pay Act collective action claims. The Parties agreed that Plaintiffs' will seek approval of the collective action settlement in the Northern District of Texas.

[2] On January 24, 2024, Defendants' counsel informed Plaintiffs' counsel that Macsteel had

Plaintiffs file this Unopposed Motion for Approval of Collective Action Settlement and Notice of Collective Action Settlement (the "Motion") requesting that the Court: (1) certify the collective action for settlement purposes only; (2) grant approval of the Settlement Agreement ("Settlement"), attached as Exhibit 1 to the Declaration of Craig J. Ackermann[3], adjudging its terms to be fair, reasonable, and adequate, and directing consummation of its terms and provisions;[4] (3) approve Craig J. Ackermann and Brian Denlinger of Ackermann & Tilajef, P.C., Matthew Clark of Gregory, Moore, Brooks & Clark, P.C., and Cheryl Legare of Legare, Attwood & Wolfe, LLC as collective action counsel; (4) approve the proposed Ameristeel Notice of Collective Action Settlement ("Ameristeel Notice," attached as Exhibit A to the Settlement Agreement), the proposed Macsteel Notice of Collective Action Settlement ("Macsteel Notice,"

---

inadvertently excluded approximately 74 potential class members from the mailing list in the prior filed *Johnson* action. In an effort to conserve the Court's and the parties' resources and expedite notice to these 74 individuals, the Parties subsequently agreed to add the potential claims of these 74 individuals to this Litigation as subclass members ("Potential Macsteel EPA Collective Action Members") while making them eligible for Individual Settlement Payments equal to those in the *Johnson* action should they opt-in to this action, and if so, making them subject to the same release of claims as the participating class members in the *Johnson* action. All Potential Macsteel EPA Collective Action Members will receive notice of this settlement and be afforded an opportunity to participate should they meet the collective action definition for the Macsteel Collective Action. All Participating Macsteel EPA Collective Action Opt-in Members will receive $6,000 (one-half as wages and one-half as non-wages) and an amount for attorneys' fees equal to one-third of such amount, i.e., $2,000. The Macsteel EPA Covered Period is August 30, 2019 to December 31, 2022. These terms were previously approved in the *Johnson* action. Attached to the Settlement as Exhibits C and D are a proposed Macsteel Notice of Collective Action Settlement ("Macsteel Notice," attached as Ex. C to the Settlement) and proposed Macsteel Opt-In Form (attached as Ex. D to the Settlement) for the Potential Macsteel EPA Collective Action Members. The Parties respectfully request approval of the inclusion of the Macsteel EPA Collective Action for purposes of sending notice to the 74 Potential Macsteel EPA Collective Action Members.

[3] The Declaration of Craig J. Ackermann is attached as "Exhibit A" to Plaintiffs' Appendix in Support of the Motion (the "Appx."), filed concurrently with this Motion, and is therefore referred to as "Appx. Exhibit A". The Declaration of Adrian Juarez Ortiz is attached as "Exhibit B" to the Appx. and is referred to as "Appx. Exhibit B." The Declaration of William Phillips is attached as "Exhibit C" to the Appx. and is referred to as "Appx. Exhibit C."

[4] Unless otherwise indicated, all exhibits are attached to Appx. Exhibit A, and all capitalized terms herein have the definitions set forth in the Settlement.

attached as Exhibit C to the Settlement Agreement), the proposed Ameristeel Opt-In Form (attached as Exhibit B to the Settlement), and the proposed Macsteel Opt-In Form (attached as Exhibit D to the Settlement), and direct their distribution to each male who was employed by Ameristeel or Macsteel in a non-union position during the Ameristeel EPA Covered Period (as to the Potential Ameristeel EPA Collective Action Members) or during the Macsteel EPA Covered Period (as to the Potential Macsteel EPA Collective Action Members), as applicable; (5) approve Plaintiffs' General Release Payments; (6) approve the payment of attorneys' fees and costs to Plaintiffs' counsel; and (7) approve CPT Group, Inc., the claims administer agreed to by the Parties. Defendants do not oppose the relief sought in this Motion.[5]

///

///

---

[5] Under the Settlement, the seventy-four (74) Potential Macsteel EPA Collective Action Members are defined as follows:

> All males who had a baby through natural birth (i.e., not adoption or placement through foster care) at any time between August 30, 2019 through December 31, 2022 while they were employed by Gerdau Macsteel, Inc. in a non-union position and did not receive notice in the *Johnson* action.

Settlement, ¶ 21. The "Macsteel EPA Covered Period" is from August 30, 2019 through December 31, 2022 (the date when Macsteel modified the maternity leave policy allowing baby bonding time to female employees, but not to male employees, to remove gender as a condition of being allowed to take paid parental leave following the birth of a child). *Id.* ¶ 8. While all non-union males who had a baby through natural birth while employed by Macsteel during the EPA Covered Period are Potential Macsteel EPA Collective Action Members, as described *infra*, the Notice and Opt-In Form shall be sent by the Claims Administrator only to the 74 males who were employed by Macsteel in a non-union position during the Macsteel EPA Covered Period and did not receive notice in the *Johnson* action, by first-class U.S. mail, and the Claims Administrator shall also mail two separate reminder postcards to the 74 males who were employed by Macsteel in a non-union position during the Macsteel EPA Covered Period and did not receive notice in the *Johnson* action. *Id.* ¶¶ 46-48. The "Participating Macsteel EPA Opt-In Members" are defined as "all Potential Macsteel EPA Collective Action Members who submit a timely and valid Opt-In Form along with Proof of Paternity." *Id.* ¶ 16.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  <u>Plaintiffs' Background and Defendant's Parental Leave Policy</u>

Plaintiff Ortiz worked for Ameristeel at its Midlothian, Texas steel mill as a non-union employee between October 23, 2017 and February 27, 2023. ECF No. 1 ("Compl."), ¶ 18. Plaintiff Phillips worked for Ameristeel at its Cartersville, Georgia steel mill as a non-union Stand Builder between September 21, 2020 and September 30, 2022. *Id.* ¶ 19. Plaintiff Ortiz's partner gave birth to their child on June 15, 2022. *Id.* ¶ 21. Plaintiff Phillips' partner gave birth to their child on May 25, 2021. *Id.* ¶ 22. Upon the birth of Plaintiffs' children, Ameristeel provided Plaintiffs, who are both male, with no paid parental leave after they requested paid parental leave, and Plaintiffs were both forced to use approximately two weeks of their earned vacation time and other paid time off. *Id.* ¶¶ 23-24.

At the time of Plaintiffs' children's birth and through December 31, 2022, Ameristeel's parental leave policy—which only applied to non-union positions—provided a much more generous 12-14 weeks of paid maternity leave for "the employee who gave birth," including six weeks of fully paid maternity leave "for such things as baby bonding and/or dealing with baby medical matters." *Id.* ¶ 25.

### B.  <u>Plaintiffs' Tolling Agreement</u>

By way of background, this case is a follow up case against a related entity of Ameristeel, Gerdau Macsteel, Inc., which alleged class claims Michigan-based male employees for violations of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. section 2000e-2, *et seq.*) based on the same theory as the instant case, which the parties agreed to settle and received final approval in the Eastern District of Michigan. *See* the *Johnson* case; *see also* Compl., n.1.

On June 7, 2023, Plaintiffs—intending to allege individual and nationwide collective action

claims for gender-based discrimination in violation of the EPA—entered into a Tolling Agreement with Ameristeel to toll their gender-based discrimination claims under the EPA and the EPA claims of the Potential Ameristeel EPA Collective Action Members. Compl., n.1; Settlement, ¶ 24.

### C. Settlement Negotiations and Modification to Ameristeel's Parental Leave Policy

Subsequent to the Parties entering into a Tolling Agreement, the Parties, through their attorneys, engaged in informal settlement discussions regarding the matter, including an exchange of discovery documents and information and an all-day, private mediation session. Settlement, ¶¶ 27-28.

Specifically, in September 2023, Ameristeel provided Plaintiffs with informal discovery documents and information, including a spreadsheet from Ameristeel's leave administrator showing non-union employees who requested FMLA leave during the Ameristeel EPA Covered Period for reasons of pregnancy/childbirth and/or to bond with a new child; and a spreadsheet showing the list of non-union employees who added newborns as dependents to Ameristeel's group health plan during the Ameristeel EPA Covered Period. *Id.* ¶ 27; Appx. Exhibit A, Page 011, ¶ 18. Thereafter, the Parties engaged in extensive negotiations regarding possible resolution, which included an all-day, private mediation session with respected employment law mediator Dina Jansenson, Esq. Settlement, ¶ 28; Appx. Exhibit A, Page 011, ¶ 18. During the mediation process, the Parties exchanged detailed mediation statements on the claims, defenses, and potential damages. *Id.* On October 10, 2023, through mediation, the Parties reached agreement regarding the general terms of the Settlement, which were memorialized in a Memorandum of Understanding. *Id.*

Between October 2023 and early-December 2023, the Parties exchanged long-form

settlement agreement drafts, developed an Opt-In process and an Opt-In Form, and a proposed Notice of Collective Action Settlement. Appx. Exhibit A, Page 012, ¶ 19. The Parties ultimately negotiated a long-form Settlement Agreement (i.e., the Settlement), which was fully executed by the Parties on December 28, 2023. *Id.* On March 6, 2024, the Parties executed an Amended Settlement Agreement including the Potential Macsteel EPA Collective Action Members. During this process, all negotiations were conducted on an arm's-length basis. *Id.*

**D.   The Legal Claims Underlying Plaintiffs' Collective Action Lawsuit**

On March 7, 2024, Plaintiffs filed this collective action alleging that Ameristeel and Macsteel violated the Federal Equal Pay Act (29 U.S.C. § 206(d) and 215(a)(2)) ("EPA") by depriving birth fathers of paid parental leave benefits that are equal to what Ameristeel afforded to birth mothers. Compl. ¶¶ 6, 42-48; Settlement, ¶ 25. Plaintiffs bring this claim under the EPA as a collective action for monetary relief pursuant to 29 U.S.C. § 216(b) on behalf of a nationwide class of all males who fathered a baby through natural birth (i.e., not adoption or placement through foster care) at any time from April 21, 2020 through December 31, 2022 (the "Ameristeel EPA Covered Period") while they were employed by Ameristeel in a non-union position in the United States (these individuals are referred to as the "Potential Ameristeel EPA Collective Action Member") and Potential Macsteel EPA Collective Action Members (defined above). Compl., ¶¶ 34-35; Settlement, ¶¶ 7-8, 15-16. Ameristeel and Macsteel deny any liability and any wrongdoing.

Plaintiffs alleged that Defendants pre-2023 paid parental leave policy is facially illegal as gender discriminatory under the EPA, since it excludes male employees (i.e., fathers who did not give birth to their children) from parental leave for "baby bonding and/or dealing with baby medical matters" which are unrelated to maternal recuperation from childbirth. Compl., ¶¶ 27-28. By way of background, the EPA provides in part that, "No employer…shall

discriminate…between employees on the basis of sex by paying wages to employees in such

establishment at a rate less than the rate at which he pays wages to employees of the opposite sex

in such establishment for equal work on jobs the performance of which requires equal skill, effort,

and responsibility, and which are performed under similar working conditions….” 29 U.S.C. §

206(d)(1). See also 29 U.S.C. § 215(a)(2).

Plaintiffs alleged that gender-discriminatory employee leave time is unlawful and

perpetuates the “pervasive sex-role stereotype that caring for family members is women’s work.”

*Nevada Department of Human Resources v. Hibbs,* 538 U.S. 721, 731 (2003). As the Supreme

Court also explained in *Hibbs*:

> Stereotypes about women’s domestic roles are reinforced by parallel stereotypes
> presuming a lack of domestic responsibilities for men. Because employers
> continued to regard the family as the woman’s domain, they often denied men
> similar accommodations or discouraged them from taking leave. These mutually
> reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced
> women to continue to assume the role of primary family caregiver, and fostered
> employers’ stereotypical views about women’s commitment to work and their
> value as employees. Those perceptions, in turn, Congress reasoned, lead to subtle
> discrimination that may be difficult to detect on a case-by-case basis.

538 U.S. 721, 736 (2003).

Other courts are similarly clear that parental leave policies that provide paid maternity

leave only to women who gave birth are unlawful because they discriminate on the basis of sex

and/or gender. *See Schafer v. Board of Public Education of the School District of Pittsburgh,* 903

F.2d 243, 248 (3d Cir. 1990) (holding that a leave policy “where the childrearing leave is made

available to females only, without a showing of a disability related to pregnancy or childbearing”

is, as a matter of law, “per se void for any leave granted beyond the period of actual physical

disability on account of pregnancy, childbirth or related medical conditions.”); *Rotondo v.*

*JPMorgan Chase Bank, N.A.*, 2019 U.S. Dist. LEXIS 201616, at *14 (S.D. Ohio Nov. 20, 2019) (noting, in an order granting final approval to a class action settlement, that "the class had a substantial likelihood of success on the merits" where male employees under Chase's leave policy, unlike female employees, "were required to make the additional showing that their spouse is either incapacitated or has returned to work prior to being deemed eligible for primary caregiver status[,]" because "[e]mployer policies may not distinguish between male and female employees based on . . . gender stereotypes related to women's presumed role as caregivers.") (citing *Cal. Fed. Sav. 13 & Loan Ass'n v. Guerra*, 479 U.S. 272, 279, n.10, 290 (1987)); *Knussman v. Maryland*, 272 F.3d 625, 636 (4th Cir. 2001) (holding that Maryland's policy and practice of refusing to provide FMLA leave to fathers violated equal protection, and noting that "gender classifications that appear to rest on nothing more than conventional notions about the proper station in society for males and females have been declared invalid time and again by the Supreme Court."); *Chavkin v. Santaella,* 81 A.D.2d 153, 157-58 (N.Y. App. Div. 1981) (noting that "there is an apparent discrimination" with regard to a leave policy "that a pregnant woman who is able to work is authorized to utilize her sick leave, while a man who has fathered a child and been given home care leave is denied the right to utilize sick leave."); *Johnson v. Univ. of Iowa*, 431 F.3d 325, 328 (8th Cir. 2005) ("If the leave given to biological mothers is granted due to the physical trauma they sustain giving birth, then it is conferred for a valid reason wholly separate from gender.").

Fringe benefits, including any period of paid or unpaid parental leave, are among the terms, conditions or privileges of employment that must be offered on a non-discriminatory basis. *Newport News Shipbuilding Co. v. EEOC*, 462 U.S. 669, 683 (1983); *Guerra*, 479 U.S. at 279 n.10. While employer policies may account for physiological differences related to pregnancy, a condition that is unique to women, they may not distinguish between male and female employees

based on "stereotypical notions about pregnancy and the abilities of pregnant workers," or based on gender stereotypes related to women's presumed role as caregivers. *Guerra*, 479 U.S. at 290. For these reasons, the United States Supreme Court has held that while employers may allow employees who give birth time off under sick or temporary disability leave policies to physically recover from childbirth, a disparity in the period of leave given to female and male employees must be limited to "the period of *actual physical disability* on account of pregnancy, childbirth, or related medical conditions." *Id.* (emphasis in original). In contrast, the Court has cautioned that statutes or policies that grant unequal caregiving leave between men and women are premised upon unlawful gender stereotypes. *Id.*

The same rule is found in the EEOC's guidance, which distinguishes between "leave related to any physical limitations imposed by pregnancy or childbirth…and leave for purposes of bonding with a child and/or providing care for a child." U.S. Equal Emp. Opportunity Comm'n, No. 915.003, *EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues*, § I.C.3 (June 25, 2015), *available at* http://www.eeoc.gov/laws/guidance/pregnancy_guidance.cfm#IC3. The EEOC explains that "parental leave must be provided to similarly situated men and women on the same terms[,]" and if "an employer extends leave to new mothers beyond the period of recuperation from childbirth (e.g. to provide the mothers time to bond with and/or care for the baby), it cannot lawfully fail to provide an equivalent amount of leave to new fathers for the same purpose." *Id.* [6]

---

[6] *See also* U.S. Equal Emp. Opportunity Comm'n, No. 915.002, *Enforcement Guidance: Unlawful Disparate Treatment of Workers with Caregiving Responsibilities* (2007), *available at* http://www.eeoc.gov/policy/docs/caregiving.html ("[E]mployers should carefully distinguish between pregnancy-related leave and other forms of leave, ensuring that any leave specifically provided to women alone is limited to the period that women are incapacitated by pregnancy and childbirth.").

In the immediate action, Plaintiffs assert that as a result of Ameristeel's and Macsteel's pre-2023 practice of only allowing non-union birth mothers to receive six weeks of fully paid maternity leave "for such things as baby bonding and/or dealing with baby medical matters," non-union birth fathers who wanted to serve as primary caregivers received six fewer weeks of paid parental leave than non-union birth mothers (i.e., non-union birth fathers received zero weeks of paid parental leave), and that this differential in paid parental leave is unrelated to birth mothers' physical need to recover from childbirth. See Compl. ¶¶ 1-3, 25-27. Plaintiffs assert that this pre-2023 policy and practice constitutes a sex-based classification that treats male employees in a manner that "but for their sex" would be different, and rests upon impermissible sex-based stereotypes about men's role as breadwinners and women's role as caregivers, thus violating the EPA. *Id.* ¶¶ 28-33, 42-48.

## III.   SUMMARY OF THE SETTLEMENT TERMS

The Settlement provides monetary relief to address Plaintiffs' concerns with Defendant's paid parental leave policy and to compensate non-union birth fathers who were adversely affected by Ameristeel's pre-2023 paid parental leave policy and who opt-in to this collective action, as discussed *infra*.

### A.   <u>The Potential Ameristeel EPA Collective Action Members and Participating Ameristeel EPA Opt-In Members</u>

Under the Settlement, the Potential Ameristeel EPA Collective Action Members are defined as follows:

> [A]ll males who fathered a baby through natural birth (i.e., not adoption or placement through foster care) at any time during the Ameristeel EPA Covered Period while they were employed by Gerdau Ameristeel US, Inc. in a non-union position in the United States.

10

Settlement, ¶ 20. The "Ameristeel EPA Covered Period" is from April 21, 2020 through December 31, 2022 (the date when Ameristeel modified the maternity leave policy allowing baby bonding time to female employees, but not to male employees, to remove gender as a condition of being allowed to take paid parental leave following the birth of a child). *Id.* ¶ 7. While all non-union males who had a baby through natural birth while employed by Ameristeel during the Ameristeel EPA Covered Period are Potential Ameristeel EPA Collective Action Members, as described *infra*, the Notice and Opt-In Form shall be sent by the Claims Administrator to all males who were employed by Ameristeel in a non-union position during the Ameristeel EPA Covered Period, excluding those Potential Ameristeel EPA Collective Action Members who have released claims against Ameristeel by any separate and unrelated agreements, by first-class U.S. mail, and the Claims Administrator shall also mail two separate reminder postcards to all males who were employed by Ameristeel in a non-union position during the Ameristeel EPA Covered Period. *Id.* ¶¶ 46-48.

The "Participating Ameristeel EPA Opt-In Members" are defined as "all Potential Ameristeel EPA Collective Action Members who submit a timely and valid Opt-In Form along with Proof of Paternity."[7] *Id.* ¶ 15.

///

---

[7] "Proof of Paternity" means proof that a Potential Ameristeel EPA Collective Action Member had a baby during the Ameristeel EPA Covered Period or proof that a Potential Macsteel EPA Collective Action Member had a baby during the Macsteel EPA Covered Period. Proof of paternity may be provided through a child's birth certificate, the addition of a newborn to their Gerdau-provided health insurance plan or the health insurance plan of their spouse during the Ameristeel EPA Covered Period or Macsteel EPA Covered Period, or through other reasonable evidence which Plaintiffs and Defendants agree to jointly evaluate on a good faith basis. If a Potential Ameristeel EPA Collective Action Member or Potential Macsteel EPA Collective Action Member submits an Opt-In Form without Proof of Paternity, the Claims Administrator shall use its best efforts to contact the Potential Ameristeel EPA Collective Action Member or Potential Macsteel EPA Collective Action Member and request Proof of Paternity." Settlement, ¶ 22.

**B.  Policy Change**

The terms of the Settlement also provide, which Plaintiffs' counsel independently confirmed, that "Defendants modified the maternity leave policy at issue in this dispute (i.e., its policy allowing baby bonding time to female employees, but not to male employees), effective January 1, 2023, to remove gender as a condition of being allowed to take paid parental leave following the birth of a child." Settlement, ¶ 69.[8] This policy change was catalyzed by the *Johnson* case, and here, Plaintiffs' counsel corroborated that Defendant notified employees of the policy change (via internal emails and other methods) and also provided employees with a one-year "look back" period which allowed employees who had children in 2022 to take paid parental leave in 2023. Appx. Exhibit A, Page 012, ¶ 19.

**C.  The Gross Settlement Amount**

The Settlement establishes a "Gross Settlement Amount" that is presently unknown prior to the Notice process, but will consist of the following payments by Defendants: (a) $6,000 Individual Settlement Payments to all Participating Ameristeel EPA Opt-In Members who fathered a baby born during the Ameristeel EPA Covered Period between April 21, 2020 through July 1, 2022, and did not take parental leave pursuant to the parental leave policy implemented on January 1, 2023, plus the employer-side payroll taxes associated with the W-2 portion of each such Individual Settlement Payment; (b) $6,000 Individual Settlement Payments to Participating Macsteel EPA Opt-In Members who fathered a baby born during the Macsteel EPA Covered Period between August 30, 2019 through December 31, 2022, plus the employer-side payroll taxes

---

[8] This paid parental leave policy change also constitutes a very significant forward-looking monetary component, and Plaintiffs' counsel will not claim any fees on those future payments; however, their existence shows that the percentage of fees sought in this action is far less than one-third of the total amount obtained, as explained *infra*.

associated with the W-2 portion of each such Individual Settlement Payment; (c) $3,000 Individual Settlement Payments to all Participating Ameristeel EPA Opt-In Members who fathered a baby born during the Ameristeel EPA Covered Period between July 2, 2022 through December 31, 2022, and did not take parental leave pursuant to the parental leave policy implemented on January 1, 2023, plus the employer-side payroll taxes associated with the W-2 portion of each such Individual Settlement Payment; (d) $1,000 Individual Settlement Payments to all Participating Ameristeel EPA Opt-In Members who fathered a baby born during the Ameristeel EPA Covered Period, and who took parental leave pursuant to the parental leave policy implemented on January 1, 2023, plus the employer-side payroll taxes associated with the W-2 portion of each such Individual Settlement Payment; (e) attorneys' fees equaling one third (1/3) of each Participating Ameristeel EPA Opt-In Members' Individual Settlement Payment and each Participating Macsteel EPA Opt-In Members' Individual Settlement Payment on top of and in addition to the Individual Settlement Payment (i.e., $2,000 per Individual Settlement Payment of $6,000; $1,000 per Individual Settlement Payment of $3,000; and $333.33 per Individual Settlement Payment of $1,000), which includes all attorneys' fees and expenses incurred to date and to be incurred in documenting the Settlement, securing trial and appellate court approval of the Settlement, attending to the administration of the Settlement, and obtaining a dismissal of the Litigation; (f) up to $15,000 for Plaintiffs' counsel's out-of-pocket litigation costs on top of and in addition to the Individual Settlement Payments (Plaintiffs' counsel will provide appropriate documentation of their out-of-pocket expenses to Defendant); (g) $10,000 each ($20,000 total) to the named Plaintiffs as consideration for their global general release of liability and waiver of claims on top of and in addition to the Individual Settlement Payments; and (h) all actual claims administration

13

costs (estimated to be $50,000, plus or minus). Settlement, ¶ 9[9]

### D. **The Notice and Opt-In Process for Potential Ameristeel EPA Collective Action Members to Receive Individual Settlement Payments**[10]

Within 15 days after the Effective Date, i.e., when the Court approves the Settlement and the Settlement becomes "Final", Defendants shall provide the Claims Administrator with the names, last known addresses, phone numbers, Social Security numbers, and dates of employment of all males who were employed by Ameristeel in the United States in a non-union position during the Ameristeel EPA Covered Period. Settlement. Settlement, ¶ 45. Within 30 days after the Effective Date, the Notice and Opt-In Form shall be sent by the Claims Administrator to all males who were employed by Ameristeel in a non-union position during the Ameristeel EPA Covered Period. *Id.* ¶ 46. The Claims Administrator shall also mail two separate reminder postcards to all males who were employed by Ameristeel in a non-union position during the Ameristeel EPA Covered Period, with the first reminder postcard being mailed 20 days after the initial mailing and the second reminder postcard being mailed 40 days after the initial mailing. *Id.*

To receive an Individual Settlement Payment, Potential Ameristeel EPA Collective Action Members must submit to the Claims Administrator a valid Opt-In Form along with Proof of Paternity by the "Opt-In Deadline" (i.e., Opt-In Forms must be postmarked and/or received via

---

[9] As an example only, if 3% of the approximate 4,052 males who will receive the Notice submit a valid Opt-In Form (i.e., 122 employees), and each fathered a child born before July 1, 2022, then the Gross Settlement Amount would be $732,000 in Individual Settlement Payments (122 x $6,000), $244,000 in attorneys' fees, plus litigation costs, Plaintiffs' General Release Payments, and claims administration costs. Plaintiffs' counsel believes it is unlikely more than 5% of the Potential Ameristeel EPA Collective Action Members will submit valid Opt-In Forms given that the vast majority of the approximate 4,052 non-union male employees who will receive the Notice likely did not have children during the Ameristeel EPA Covered Period.

[10] All of the same terms and the same timeline will apply to Potential Macsteel EPA Collective Action Members and they must meet the same requirements to become a Participating Macsteel EPA Opt-In Member.

email by the Claims Administrator within 60 calendar days after the initial mailing of the Notice and Opt-In Forms). *Id.* ¶ 53. Plaintiffs' Counsel and Defendant's Counsel may mutually agree to, but need not, in their respective sole discretion, accept late-filed Opt-In Forms with Proof of Paternity that are received after the Opt-In Deadline. *Id.* If a Potential Ameristeel EPA Collective Action Member disagrees with the Claims Administrator's determination of whether a timely and valid Opt-In Form with Proof of Paternity was submitted—after consultation with Plaintiffs' counsel and Defendant's counsel on a good faith basis—the Potential Ameristeel EPA Collective Action Member may dispute such information by submitting to the Claims Administrator additional documents, information, and/or other evidence to prove that they fathered a baby born by natural birth during the EPA Covered Period. *Id.* ¶ 54.

The Notice and Opt-In Form shall provide all Potential Ameristeel EPA Collective Action Members with notice of the Settlement, its terms and their right to submit an Opt-In Form along with valid Proof of Paternity during the Ameristeel EPA Covered Period, and the scope of the claims being released if they opt-in to receive the Individual Settlement Payment. *Id.* ¶ 51, Exs. A-B. The Notice and Opt-In Form explain that the Potential Ameristeel EPA Collective Action Members who wish to receive any portion of the Settlement must submit a timely and valid Opt-In Form with Proof of Paternity (i.e. Participating Ameristeel EPA Opt-In Members ), and only those who submit a timely and valid Opt-In Form with Proof of Paternity can receive an Individual Settlement Payment, and that each Participating Ameristeel EPA Opt-In Member will be bound for purposes of the Settlement in the Litigation by the releases set forth in the Settlement. *Id.* ¶ 53, Exs. A-B.

### E.  Releases[11]

Each Participating Ameristeel EPA Opt-In Member (including the Named Plaintiffs) will irrevocably release and discharge Ameristeel and the Released Parties from all claims and causes of action that are or that could be based upon the facts alleged in the Complaint, including claims for gender-based discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq*.); the Federal Equal Pay Act (29 U.S.C. § 206(d)); and any other applicable state, local, and/or federal laws based on the location of the Participating Ameristeel EPA Opt-in Member for alleged violations resulting from Defendants' maternity leave policy and/or practice of only allowing its female employees, but not male employees, to take 6-weeks of parental leave time off for baby bonding and/or dealing with baby medical matters, as well as with all liquidated damages, penalties, interest and other amounts recoverable under said causes of action under any state or federal law, to the fullest extent possible (collectively the "Released Claims"). Settlement, ¶ 56. The Release Period shall be identical to the Ameristeel EPA Covered Period. *Id.*

### F.  Individual Settlement Payments to Participating Ameristeel EPA Opt-In Members[12]

Participating Ameristeel EPA Opt-in Members shall each receive an Individual Settlement

---

[11] Participating Macsteel EPA Opt-In Members will release the same claims released by participating members in the *Johnson* action.

[12] Participating Macsteel EPA Opt-in Members shall each receive an Individual Settlement Payment of $6,000 on a gross basis (as described in Section III.C, *supra*), which shall be allowed as follows: 50% of each Individual Settlement Payment is reportable as W-2 wages, less applicable employee-side tax withholdings and deductions for which an IRS Form W-2 will be issued to each Participating Macsteel EPA Opt-In Member (Macsteel shall pay its employer-side payroll taxes associated with the W-2 portion of each Individual Settlement Payment); and 50% of each Individual Settlement Payment is reportable as 1099 income for which an IRS Form 1099 will be issued to each Participating Macsteel EPA Opt-In Member. Settlement, ¶¶ 10, 40(a). The timing to negotiate settlement checks and processes to handle remaining funds will follow the same process and timeline for Participating Ameristeel EPA Opt-in Members.

Payment of $6,000, $3,000, or $1,000 on a gross basis (as described in Section III.C, *supra*), which shall be allowed as follows: 50% of each Individual Settlement Payment is reportable as W-2 wages, less applicable employee-side tax withholdings and deductions for which an IRS Form W-2 will be issued to each Participating Ameristeel EPA Opt-In Member (Ameristeel shall pay its employer-side payroll taxes associated with the W-2 portion of each Individual Settlement Payment); and 50% of each Individual Settlement Payment is reportable as 1099 income for which an IRS Form 1099 will be issued to each Participating Ameristeel EPA Opt-In Member. Settlement, ¶¶ 10, 40(a).

Since attorneys' fees and litigation costs, Plaintiffs' General Release Payments, and all actual claims administration costs shall be paid by Defendants on top of and in addition to the Individual Settlement Payments, only the employee-side tax withholdings and deductions on the W-2 portion of Individual Settlement Payments will be taken out of Participating Ameristeel EPA Opt-In Members' Individual Settlement Payments. *Id.* Participating Ameristeel EPA Opt-In Members will have 180-days to cash the checks that they receive, and if any Participating Ameristeel EPA Opt-In Members do not cash their checks within the 180-day Check Cashing Period, any funds associated with such uncashed checks shall be distributed pursuant to a *cy pres* as agreed upon by the Parties, subject to approval by the Court. *Id.* ¶¶ 2, 39, 59.

G. **Attorneys' Fees, Litigation Expenses, and Plaintiffs' General Release Payments**[13]

The Settlement provides that Ameristeel shall pay Plaintiffs' counsel's attorneys' fees equaling 1/3rd of each Participating Ameristeel EPA Opt-In Members' Individual Settlement

---

[13] The Settlement provides that Macsteel shall pay Plaintiffs' counsel's attorneys' fees equaling 1/3rd of each Participating Macsteel EPA Opt-In Members' Individual Settlement Payment on top of and in addition to the Individual Settlement Payment (i.e., $2,000 per Individual Settlement Payment of $6,000).

Payment on top of and in addition to the Individual Settlement Payment (i.e., $2,000 per Individual Settlement Payment of $6,000; $1,000 per Individual Settlement Payment of $3,000; and $333.33 per Individual Settlement Payment of $1,000), subject to Court approval. Settlement, ¶¶ 9(e), 36. The Settlement also provides that Ameristeel shall pay reimbursement of class counsel's out-of-pocket litigation costs up to $15,000 on top of and in addition to the Individual Settlement Payments, subject to approval by the Court. *Id.* ¶¶ 8(f), 36. *See also* Appx. Exhibit A, Page 016-017, ¶ 26 (as of April 9, 2024, Plaintiffs' counsel has incurred $5,975.09 in litigation costs).

The Settlement provides that Ameristeel shall pay Plaintiffs a General Release Payment of $10,000 each (i.e., $20,000 total) as consideration for their global general release of liability and waiver of claims, subject to approval by the Court. Settlement, ¶¶ 8(g), 37. Plaintiffs' General Release Payments will be in addition to Plaintiffs' Individual Settlement Payments, and Plaintiffs must execute a full general release of all claims against Ameristeel through the date the general release is signed. *Id.* ¶¶ 8(g), 37, 60.

### H.  Claims Administrator

The Parties agree and propose that the Court appoint CPT Group, Inc. as the Claims Administrator. See Appx. Exhibit A, Page 016, ¶ 25. CPT Group, Inc. is experienced in claims administration, having administered thousands of class and collective action settlements, including numerous EPA and FLSA opt-in settlements (see https://www.cptgroup.com/about-us/). *Id.* Defendants shall pay all of the actual costs of the Claims Administrator to fully administer this Settlement on top of and in addition to all Individual Settlement Payments. Settlement, ¶¶ 8(g), 34.

### IV.   COLLECTIVE ACTION SETTLEMENT PROCEDURE

This litigation involves claims for alleged gender discrimination against men in parental

leave—for six-weeks of allegedly unpaid parental leave time—brought under the EPA, 29 U.S.C. § 201 *et seq*. The EPA provides in part that, "No employer…shall discriminate…between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions…." 29 U.S.C. § 206(d)(1). See also 29 U.S.C. § 215(a)(2).

Plaintiffs seek approval of this collective action using a "one-step settlement approval process wherein the collective action will be certified for settlement purposes only and notice will be issued." Settlement, ¶ 34. "A one-step settlement approval process in FLSA collective actions is appropriate." *Osman v. Grube, Inc.*, 2018 U.S. Dist. LEXIS 78222, at *3-4 (N.D. Ohio May 4, 2018) (citing cases).[14] This is because, unlike a Rule 23 class action, "[c]ollective actions under 29 U.S.C. § 216(b) require workers to affirmatively opt-in to the litigation…." *Id.*; *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) ("Rule 23 actions are fundamentally different from collective actions under the FLSA [and EPA]."). "Because the failure to opt in to an FLSA [and EPA] lawsuit does not prevent potential members of the collective from bringing their own suits in the future, FLSA [and EPA] collective actions do not implicate the same due process concerns as do Rule 23 actions." *Osman*, 2018 U.S. Dist. LEXIS 78222, at *4 (citing *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579-80 (7th Cir. 1982)). Courts in this Circuit have approved one-step FLSA and EPA settlements. *See Jasso v. HC Carriers, LLC*, 2022 U.S. Dist. LEXIS 207043 (S.D. Tex. Oct. 19, 2022) (approving an FLSA collective, notice to the

---

[14] The EPA is part of the FLSA, 29 U.S.C. § 201, *et seq*. *Herster v. Bd. of Supervisors of La. State Univ.*, 2013 U.S. Dist. LEXIS 77737, at *20 (M.D. La. June 3, 2013).

collective action members, and the settlement all in one order); *Stanley v. Patriot Inspection Servs.*, 2021 U.S. Dist. LEXIS 14028 (W.D. Tex. Jan. 26, 2021) (analyzing whether the FLSA settlement was fair and reasonable at the same time as conditional certification of the collective action, and simultaneously approving the settlement and proposed notice).

## V.  APPROVAL OF THE SETTLEMENT IS APPROPRIATE

FLSA and EPA claims may be compromised after the Court reviews and approves a settlement in a private action for back wages under 29 U.S.C. § 216(b). *Diaz v. Panhandle Maint., LLC*, 2020 U.S. Dist. LEXIS 21482, at *4 (N.D. Tex. Feb. 6, 2020) (citing *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982)). There is "a presumption in favor of finding a settlement fair and the overriding public interest in favor of settlement." *Id.* (citing *Lee v. Metrocare Services*, 2015 U.S. Dist. LEXIS 194001, at *7 (N.D. Tex. July 1, 2015) and *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). "If the settlement reflects 'a reasonable compromise over issues,' the court may approve it." *Villeda v. Landry's Rests., Inc.*, 2009 U.S. Dist. LEXIS 93480, at *2 (S.D. Tex. Oct. 7, 2009) (quoting *Lynn's,* 679 F.2d at 1354).

When scrutinizing an FLSA and EPA settlement agreement, a court considers two primary factors: (1) whether there exists a bona fide dispute; and (2) that the settlement agreement is fair and reasonable. *Jones v. JGC Dallas LLC*, 2014 U.S. Dist. LEXIS 177472, at *9-12 (N.D. Tex. Nov. 12, 2014). Although the Parties have decidedly different views of the merits of the litigation, all agree the Settlement is fair, reasonable, and represents a reasonable compromise of the bona fide, disputed issues in this case. Accordingly, Plaintiffs request that the Court approve the Settlement, certify the collective action for settlement purposes, and approve the proposed Notice and direct its mailing.

///

A.  **The Settlement Represents a Compromise of a Bona Fide Dispute**

When a court scrutinizes an FLSA or EPA settlement agreement, it must determine that the compromise is a fair and reasonable resolution of a *bona fide* dispute. *Lynn's*, 679 F.2d at 1355. Thus, the Court should approve a settlement where there is a "bona fide dispute" amongst the parties. *See*, *e.g.*, *Bodle v. TXL Mortg. Corp.*, 788 F.3d 159, 163 (5th Cir. 2015). "To satisfy the bona fide dispute requirement, there must be at least some doubt as to who will succeed on the merits." *Diaz*, 2020 U.S. Dist. LEXIS 21482 at *6 (citations omitted). *See, e.g., Martin v. Spring Break '83 Prods., LLC*, 688 F.3d 247, 255-56 (5th Cir. 2012) (finding a bona fide dispute where the parties disagreed about the number of hours for which they are owed their set rate of pay). Here, there is no question a bona fide dispute exists between the parties.

Plaintiffs maintain that their EPA claims are strong, and that similar to the cases described in Section II.D, *supra*, Defendant's pre-2023 practice of only providing non-union birth mothers with six weeks of fully paid maternity leave "for such things as baby bonding and/or dealing with baby medical matters" constitutes sex discrimination. Plaintiffs allege that Defendants' policy of allowing six weeks of "baby bonding" leave only for non-union birth mothers was facially illegal since it was not a pregnancy-related disability policy and it was unrelated to the period of time necessary for recovery from childbirth.[15] Plaintiffs maintain that Defendants' paid parental leave

---

[15] Defendants' parental leave policy, which is the subject of this action, stated the following in its entirety: "Length of Leave – Following the birth of a child, **the employee who gave birth** will be eligible for six (6) workweeks of short-term disability for natural birth, or eight (8) workweeks of short-term disability for C-section. Short-term disability pays 60% of base pay up to a defined weekly maximum. For Salaried Exempt employees, the first two (2) workweeks of short-term disability are paid at 100% of base pay. Following the end of the six (6) weeks or eight (8) weeks of short-term disability, **the same employee will also be entitled to six (6) consecutive weeks of Maternity Leave, paid at 100% of base pay. This leave is provided for such things as baby bonding and/or dealing with baby medical matters.** It must be taken immediately following disability leave, and may not be taken intermittently. If the employee returns to work prior to using

policy "for such things as baby bonding and/or dealing with baby medical matters" should therefore have been made available on a gender-neutral basis. See *Guerra*, 479 U.S. at 290; *Hibbs*, 538 U.S. at 730; *Schafer*, 903 F.2d at 248. Accordingly, Plaintiffs allege that they and numerous other non-union birth fathers otherwise eligible to take paid "baby bonding" parental leave have a strong case for liability under the EPA for Defendants' unlawful withholding of up to six weeks of wages due pursuant to 29 U.S.C. §§ 206(d)(1), 215(a)(2).

Despite the strength of Plaintiffs' collective claims on the merits, they fully recognize that they would face significant legal and procedural hurdles in establishing liability and damages. Plaintiffs recognize the substantial risks of the litigation, including the possibility that the case, if not settled now, might result in no recovery or a far less favorable recovery to them and the Potential EPA Collective Action Members. Plaintiffs are also aware that if the action continued, any recovery may not occur for several years.

Defendants did and would likely argue that: 1) the purported injury is for the intangible loss of baby bonding time, which is not a wage claim and/or cannot be calculated individually; 2) Plaintiffs were and are time-barred from alleging a claim for gender discrimination under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e-2, *et seq*.), that an EPA claim is different than a Title VII claim, and that whereas Title VII provides plaintiffs with the potential recourse of compensatory damages, EPA claims do not provide such recourse and there are disputed questions as to whether Plaintiffs' EPA claims alone apply to what Defendants assert is at best an intangible loss of baby bonding time injury rather than a wage claim; 3) it has a waiver defense, since many Potential EPA Collective Action Members are hourly-paid, rather than

---

the full six (6) weeks of Maternity Leave, the employee has forfeited use of any additional Maternity Leave." Appx. Exhibit A, Page 009-010, ¶ 15 (emphasis added).

salaried employees, and they therefore may not have taken all or any of the six weeks of baby bonding parental leave time since hourly-paid employees make a significant amount of their compensation through overtime pay (i.e., many hourly-paid employees would have chosen to work and earn overtime pay rather than take parental leave); 4) Defendants' parental leave policy did not force anyone to take parental leave, that the circumstances by which each birth father requested and/or was denied parental leave renders Plaintiffs not similarly situated to the Potential Ameristeel EPA Collective Action Members, and that there are disputes regarding the correct method for calculating alleged damages; 5) this Court may not properly exercise jurisdiction over the collective action claims of out-of-state opt-in plaintiffs other than in the states in which Defendants have its principal place of business or where it is incorporated pursuant to *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255 (2017) and subsequent cases,[16] and that all opt-in plaintiffs would need to establish specific personal jurisdiction over Defendants with respect to their individual claims and are therefore not "similarly situated" pursuant to 29 U.S.C. § 216(b); 6) Defendants changed their parental leave policy beginning January 1, 2023 to remove gender as a condition of being allowed to take paid parental leave following the birth of a child, that it notified employees of the policy change (via internal emails and other methods) and also provided employees with a one-year "look back" period which allowed employees who had children in 2022 to take paid parental leave in 2023, so all Potential Ameristeel EPA Collective Action Members

---

[16] *See Bristol-Myers*, 582 U.S. at 262 ("[T]here must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.") (citations and internal quotations omitted); *Fischer v. Fed. Express Corp.*, 42 F.4th 366, 385 (3d Cir. 2022) (joining the Sixth and Eighth Circuits in concluding that *Bristol-Myers* applies to FLSA collective actions, and holding that "in an FLSA collective action…each opt-in plaintiff must demonstrate that the court has personal jurisdiction over the defendant with regard to [their] claims.").

who had children born in 2022 were either able to take the paid parental leave made available to them or chose not to; 7) that Defendants could argue a good faith defense as to Plaintiffs' claim to liquidated damages; and 8) that Plaintiffs could not demonstrate that Defendants acted willfully, which in turn affects whether they could recover compensation for two years or three years pursuant to 29 U.S.C. § 255. Appx. Exhibit A, Page 012-013, ¶ 19.

Plaintiffs and their counsel, who are experienced class and collective action employment attorneys, understand the resolution of these liability issues, the outcome of a trial, and a likely appeal are inherently uncertain in outcome and duration. The Parties respectively continue to believe that their positions are correct, and the Court accordingly should readily conclude that a bona fide dispute between the Parties exists. *See Dyson v. Stuart Petroleum Testers, Inc.*, 2016 U.S. Dist. LEXIS 24190, at *5 (W.D. Tex. Feb. 29, 2016) (acknowledging a *bona fide* dispute exists when the parties both continue to insist that their legal positions are correct). Without the Parties' willingness to engage in settlement discussions, this case would not have been resolved.

### B.  The Settlement is Fair and Reasonable

Courts "must scrutinize the terms of a proposed settlement agreement in an FLSA dispute to ensure the resolution is fair and reasonable." *Diaz*, 2020 U.S. Dist. LEXIS 21482 at *8 (citing *Lynn's*, 679 F.2d at 1355). The Fifth Circuit has set forth six factors for evaluating FLSA / EPA settlement proposals, which are "derived from Rule 23 Class Action litigation":

> (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representative, and the absent class members.

*Id.* (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)). "A district court has

discretion to fashion appropriate procedures for review of FLSA collective actions, and courts have adopted and varied the *Parker* factors 'in light of the special role of the court in settlement of FLSA claims.'" *Lee*, 2015 U.S. Dist. LEXIS 194001 at *7 ("the court also should keep in mind the presumption in favor of finding a settlement fair and the overriding public interest in favor of settlement.") (citation omitted).

Here, the proposed Settlement is fair and reasonable. Through the time allowed to them via the Tolling Agreement, the Parties were able to resolve this action in an adversarial, yet cordial, manner at mediation after becoming sufficiently familiar with the facts and law relevant to the case, which enabled the Parties to reach a fair settlement. *Tharp v. Energes LLC*, 2018 U.S. Dist. LEXIS 237660, at *5-6 (W.D. Tex. July 16, 2018).

With regard to the first factor, the Settlement here is a product of the extended negotiations by the Parties, including an exchange of relevant discovery pre-mediation, as well as the participation in a full-day, private mediation with a skillful, experienced employment law mediator, Dina Jansenson, Esq., and subsequent negotiations to finalize the Settlement terms. Appx. Exhibit A, Pages 011-013, ¶¶ 17-19. All of this weighs against a finding that the Parties engaged in collusion. *See Jones*, 2014 U.S. Dist. LEXIS 177472 at *12-13 (finding no evidence the settlement was a product of fraud or collusion where "the parties participated in mediation before an experienced mediator" and was the result of "arms-length negotiations"); *Smith v. M-I, LLC*, 2019 U.S. Dist. LEXIS 114596, at *5-6 (W.D. Tex. Feb. 26, 2019) (finding settlement fair and reasonable when it was negotiated by experienced attorneys and reflected an arms' length compromise of the disputed claim.").

Regarding the second factor, by reaching a favorable settlement prior to dispositive motions, conditional certification, or trial, Plaintiffs avoided significant expense, risk, and delay,

and instead ensured a significant recovery for the Participating Ameristeel EPA Opt-In Members. Courts recognize that collective actions are inherently complex and that settlement avoids the "burden, expense and uncertainty" associated with litigation. *Vassallo v. Goodman Networks, Inc.*, 2016 U.S. Dist. LEXIS 142379, at *5 (E.D. Tex. Oct. 13, 2016); *see also Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010) ("When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened."); *Schaefer v. Tannian*, 1995 U.S. Dist. LEXIS 11816, at *28 (E.D. Mich. Apr. 17, 1995) ("The track record for large class action employment discrimination cases demonstrates that many years may be consumed by trials and appeals before the dust finally settles."). This case is no exception, with Plaintiffs pleading relatively novel sex discrimination claims under the EPA on behalf of numerous Potential Ameristeel EPA Collective Action Members. See Appx. Exhibit A, Page 016, ¶ 24.

Further litigation would cause additional expense and delay. Plaintiffs would potentially need to defeat an initial motion to dismiss. Extensive fact and expert discovery would be needed to establish liability, damages, and conditional certification. The Parties would likely cross-move for summary judgment, requiring extensive briefing and delaying the resolution of the merits. If the Court found that factual disputes bar summary judgment, a lengthy trial would occur. Any judgment would likely be appealed, further extending the litigation. This Settlement, on the other hand, provides significant relief to Potential Ameristeel EPA Collective Action Members in a prompt and efficient manner. Therefore, this factor weighs in favor of approval.

Regarding the third factor (the stage of the proceedings and amount of discovery completed), during the course of the negotiation, the Parties exchanged sufficient discovery and relevant information to resolve this case in a manner that is fair and responsible. In evaluating this

factor, courts must consider whether "the parties have gleaned sufficient information 'to evaluate the merits of the competing positions.'" *Sved v. Chadwick*, 783 F. Supp. 2d 851, 861 (N.D. Tex. 2009) (A court "looks not to the amount of discovery, but rather to 'whether the parties have obtained sufficient information about the strengths and weaknesses of their respective cases to make a reasoned judgment about the desirability of settling the case on the terms proposed or continuing to litigate it.'") (citations omitted). This Court has recognized that "[f]ormal discovery is not a prerequisite to settlement." *Schwartz v. TXU Corp.*, 2005 U.S. Dist. LEXIS 27077, at *64 (N.D. Tex. Nov. 8, 2005). *See also Evans v. Greenlaw*, 2018 U.S. Dist. LEXIS 80569, at *11-12 (N.D. Tex. May 14, 2018) (finding that although the litigation was "at an early stage" and "there has not been any formal discovery," the exchange of informal discovery by the parties provided the plaintiff with "sufficient information to gauge the strength and weaknesses of his claims and the probability of success on the merits.").

Here, the Parties undertook a range of relevant discovery that led to informed negotiations and settlement. Plaintiffs' counsel initially interviewed Plaintiffs to investigate how their parental leave requests were treated, their interactions with Ameristeel's management and human resources department, and other facts. Appx. Exhibit A, Page 011, ¶ 17. Plaintiffs also provided their counsel with a copy of the paid parental leave policy at issue in this action. *Id.* Before mediation, Ameristeel provided Plaintiffs' counsel with a range of information on its parental leave policy and how it was applied, as well as informal discovery documents and information, including a spreadsheet from Ameristeel's leave administrator showing non-union employees who requested FMLA leave during the Ameristeel EPA Covered Period for reasons of pregnancy/childbirth and/or to bond with a new child; and a spreadsheet showing the list of non-union employees who added newborns as dependents to Ameristeel group health plan during the Ameristeel EPA

Covered Period. Appx. Exhibit A, Page 011-012 ¶ 18; Settlement, ¶ 27. Before mediation, Plaintiffs' counsel conducted a thorough investigation into the facts of this litigation and diligently pursued an investigation of the Potential Ameristeel EPA Collective Action Members' claims against Ameristeel, including engaging in pre-mediation investigation, reviewing data and documents, and researching the applicable law, claims and potential defenses, conditional certification, potential relief, and the ascertainability of the Potential Ameristeel EPA Collective Action Members. Appx. Exhibit A, Page 011-012, ¶ 18; Settlement, ¶ 30. Plaintiffs' counsel drafted and exchanged a detailed mediation brief to inform Ameristeel of the key facts and legal issues, and the Parties engaged in extensive negotiations regarding possible resolution, including an all-day, private mediation session with respected employment law mediator, Dina Jansenson, Esq., on October 10, 2023.[17] Appx. Exhibit A, Page 011-012, ¶ 18; Settlement, ¶ 28. All of the aforementioned discovery and information, plus numerous phone calls and emails between counsel for the Parties prior to and after mediation, informed the mediation session and subsequent negotiations, and ultimately led to an informed Settlement. Appx. Exhibit A, Page 011-012, ¶ 18. These circumstances show "the parties were sufficiently informed to decide whether settlement was in their best interest." *Sved*, 783 F. Supp. 2d at 862.

Regarding the fourth factor, Plaintiffs refer the Court to Section V.A, *supra*, which describes in detail the factual and legal obstacles to prevailing on the merits, including Defendants' defenses that: the purported injury is for the intangible loss of baby bonding time, which is not a wage claim; Plaintiffs were and are time-barred from alleging Title VII claims, and that the EPA claims alleged do not allow compensatory damages and there are disputed questions as to whether

---

[17] With respect to Macsteel, the parties participated in a mediation and exchanged similar information and the settlement was approved in the *Johnson* matter. The Macsteel employees at issue were inadvertently excluded from receiving notice and are receiving notice here as a subclass.

Plaintiffs' EPA claims alone apply; Defendants have a waiver defense, since many Potential Ameristeel EPA Collective Action Members are hourly-paid; the circumstances by which each birth father requested and/or was denied parental leave renders Plaintiffs not similarly situated to the Potential Ameristeel EPA Collective Action Members; this Court may not properly exercise jurisdiction over the collective action claims of out-of-state opt-in plaintiffs; Defendants notified employees of its paid parental leave policy change and also provided employees with a one-year "look back" period; Defendants could argue a good faith defense as to Plaintiffs' liquidated damages claim; and Plaintiffs could not demonstrate that Defendants acted willfully.

Regarding the fifth factor, the possible range of recovery and certainty of damages, it is important to note that even in the absence of Defendants' defense that Potential Ameristeel EPA Collective Action Members' purported injury is for the intangible loss of baby bonding time, and not a wage claim, the maximum amount of recovery for any Potential Ameristeel EPA Collective Action Member would be the equivalent of six weeks of unpaid "baby bonding" parental leave time, plus potential liquidated damages. The combined average weekly wage of Plaintiffs, assuming 40-hour work weeks, equals approximately $700,[18] meaning six weeks of paid paternity leave back wages would equal $4,200.

The Parties have agreed to settle this case for a "Gross Settlement Amount" that is presently unknown prior to the Notice process, but will consist of Individual Settlement Payments to each Participating Ameristeel EPA Opt-In Member of either $6,000 (for those who fathered a baby born during the Ameristeel EPA Covered Period between April 21, 2020 through July 1, 2022, and did not take parental leave pursuant to the parental leave policy implemented on January 1, 2023),

---

[18] Plaintiff Phillips was paid $18.96 per hour, and Plaintiff Ortiz was paid $16.00 per hour. Appx. Exhibit A, Page 015, ¶ 21.

$3,000 (for those who fathered a baby born during the Ameristeel EPA Covered Period between July 2, 2022 through December 31, 2022, and did not take parental leave pursuant to the parental leave policy implemented on January 1, 2023), or $1,000 (for those who fathered a baby born during the Ameristeel EPA Covered Period, and who took parental leave pursuant to the parental leave policy implemented on January 1, 2023) and Individual Settlement Payments to each Participating Macsteel EPA Opt-In Member of $6,000. Settlement, ¶¶ 9(a)-(c). This Individual Settlement Payment structure was negotiated by the Parties to account for the fact that Defendants changed their parental leave policy beginning January 1, 2023, plus it notified employees of the policy change and provided employees with a one-year "look back" period which allowed employees who had children in 2022 to take paid parental leave in 2023, which some employees did.

This is a significant recovery—and supports that the Settlement is fair—especially considering each Potential Ameristeel EPA Collective Action Members' possible recovery through this action consists of potential wages owed for six-weeks of unpaid parental leave time. By way of example, if a Potential Ameristeel EPA Collective Action Member fathered a baby born on July 1, 2022, and he did not take parental leave pursuant to the parental leave policy implemented on January 1, 2023, that individual would be compensated at a rate of $1,000 per week for every week that could have been owed for paid parental leave time, (i.e., $6,000 total), which also assumes that individual would take the full six-weeks of paid parental leave time had it been available to them. Appx. Exhibit A, Page 015, ¶ 21. Weighing the substantial benefits of the Settlement against the available evidence and the risks associated with proceeding in the litigation, the settlement amount and Individual Settlement Payment amounts are reasonable, especially considering that Potential Ameristeel EPA Collective Action Members can choose to

not opt in to this collective action and can instead preserve their rights and/or initiate their own action.

Finally, regarding the sixth factor, the recommendation in this case by experienced and highly-regarded counsel for both Parties should guide the Court to grant approval. "When reviewing settlement agreements, courts are 'entitled to rely upon the judgment of experienced counsel for the parties…[and] absent fraud, collusion, or the like, [courts] should be hesitant to substitute its own judgment for that of counsel.'" *Jones*, 2014 U.S. Dist. LEXIS 177472 at *16 (citing *Cotton*, 559 F.2d at 1330). While the Court is "not bound by counsels' opinion, their opinions nonetheless weigh heavily in favor of approving the settlement." *Lee*, 2015 U.S. Dist. LEXIS 194001 at *18-19 (citation omitted).

Here, a group of experienced civil rights attorneys recommend this Settlement as an excellent resolution for the Potential Ameristeel EPA Collective Action Members. Plaintiffs' counsel have extensive experience litigating complex employment class actions. See Appx. Exhibit A, Pages 002-009, ¶¶ 4-14. In this case, counsel engaged in sufficient discovery and negotiations to make a well-informed settlement decision. *Id.* Pages 011-013, ¶¶ 17-19. Counsel negotiated at arm's-length with the aid of an experienced employment law mediator, Dina Jansenson, Esq. *Id.* Page 011-012, ¶ 18; Settlement, ¶ 28. Similarly, Plaintiffs fully support the Settlement and have expressed their opinion that the Settlement is fair and reasonable, including by agreeing to the terms of the Settlement. Appx. Exhibit A, Page 015-016, ¶ 23; *see Lee*, 2015 U.S. Dist. LEXIS 194001 at *19 (noting that "Plaintiffs have expressed an opinion in this case inasmuch as they have…assented to the terms of the Agreement.").

Regarding the opinions of the Potential Ameristeel EPA Collective Action Members, as recognized by this Court, "FLSA § 216(b) requires that class members give their affirmative

consent to join the action…. Thus, there are no 'absent class members' in an FLSA collective action…." *Id.* at *18. The same is true in this EPA opt-in action. Here, Potential Ameristeel EPA Collective Action Members will be sent a copy of the Notice and Opt-In Form and will have the option to affirmatively opt-in to the Settlement or not. Settlement, ¶ 39, Exs. A-B. Only those Potential Ameristeel EPA Collective Action Member who submit a timely and valid Opt-In Form with Proof of Paternity (i.e., the Participating Ameristeel EPA Opt-In Members) will release Defendants from liability for the claims and causes of action falling within the definition of Released Claims. *Id.* ¶¶ 39, 61. Accordingly, should any Potential Ameristeel EPA Collective Action Members choose to not opt in to this collective action, they will not be subject to or bound by any release of claims, nor will they receive an Individual Settlement Payment. *Id.* Moreover, many birth fathers who were deterred from seeking paid parental leave may not be aware that their rights were potentially violated at all.

Accordingly, and considering the presumption in favor of finding a settlement fair, the Settlement's significant monetary relief to Potential Ameristeel EPA Collective Action Members to compensate employees allegedly harmed by Ameristeel 's pre-2023 parental leave policy, the fact that Ameristeel now maintains a gender-neutral parental leave policy, and in light of the strengths and weaknesses of the case, the Settlement achieves excellent benefits for Potential Ameristeel EPA Collective Action Members and is therefore fair and reasonable.

C. **The Proposed Attorneys' Fees and Costs to Plaintiffs' Counsel are Fair and Reasonable**

Plaintiffs' counsels' request for attorneys' fees equaling one-third (1/3) of each Participating Ameristeel EPA Opt-In Members' and Participating Macsteel EPA Opt-In Members Individual Settlement Payment on top of and in addition to each Individual Settlement Payment

(i.e., $2,000 per Individual Settlement Payment of $6,000; $1,000 per Individual Settlement Payment of $3,000; and $333.33 per Individual Settlement Payment of $1,000), is also fair and reasonable, and Defendants do not oppose such an award. Settlement, ¶¶ 9(e), 36. The Fifth Circuit recognizes that in common fund cases like the immediate case, the "percentage method" where a court "awards fees as a reasonable percentage of the common fund" is desirable because it is "predictable, encourages settlement, and reduces incentives to protract litigation." *Union Asset Mgmt. v. Dell, Inc.*, 669 F.3d 632, 643-44, n.34 (5th Cir. 2012) (citations omitted). Moreover, while the Fifth Circuit has not explicitly endorsed the percentage method, it is the only circuit yet to do so. *See id.* at 643, n.28 (recognizing that the U.S. Supreme Court has indicated that the percentage method is appropriate, and it has "never spoken to the appropriateness or desirability of the lodestar method in common fund cases.") (citations omitted). *See also In re Combustion, Inc.*, 968 F. Supp. 1116, 1134 (W.D. La. 1997) ("The law of the Fifth Circuit as to which of the two methods should be employed in common fund cases is at best unclear.").

Within the Fifth Circuit, customary contingency fees for common funds have ranged from 33.33% to 50%. *See In re Bayou Sorrel Class Action*, 2006 U.S. Dist. LEXIS 80924, at *16-17 (W.D. La. Oct. 31, 2006). "If the request is relatively close to the average awards in cases with similar characteristics, the court may feel a degree of confidence in approving the award." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 675 (N.D. Tex. 2010), *citing* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 1, 37-38 (2004) (noting that awards between 26.8% and 36% should be considered potentially reasonable provided there is some affirmative justification for the award). *See also In re Harrah's Entm't, Inc.*, 1998 U.S. Dist. LEXIS 18774, at *11 (E.D. La. Nov. 24, 1998) ("It is not unusual…for district courts in the Fifth Circuit to award percentages of approximately one

third."); *In re Prudential-Bache Energy Income Partnerships Sec. Litig.*, 1994 U.S. Dist. LEXIS 4786, at *3 (E.D. La. Apr. 14, 1994) ("Historically, fee awards in common fund cases…were computed based upon a percentage of the fund, typical in the 25% to 33% range.") (citation omitted); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (approving fee award of 36% of the common fund). "Further, cases in which courts have found considerably lower percentage awards appropriate tend to be 'mega cases,' with common funds exceeding $100 million." *Lee*, 2015 U.S. Dist. LEXIS 194001 at *21-22 (citing *Klein*, 705 F. Supp. 2d at 675).

In evaluating a common fund fee award, the Court may also look at the factors set forth in *Johnson v. Georgia Hwy. Exp., Inc.*, 488 F.2d 714, 717-20 (5th Cir. 1974). "To account for the Fifth Circuit's preference for a *Johnson* analysis, numerous district courts in this Circuit have primarily applied a 'blended' percentage method to determine a reasonable fee award." *Klein*, 705 F. Supp. 2d at 674 (internal quotation marks omitted). "The 'blended' percentage method 'uses the percentage method to establish a benchmark fee and then checks this amount against a reasonableness test based on consideration of the *Johnson* factors.'" *Id.*

"The twelve factors set out in *Johnson* are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the claimant's attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the claimant or the circumstances; (8) the amount of recovery involved and the results obtained; (9) counsel's experience, reputation, and ability; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the claimant; and (12) awards in similar cases." *Jones*, 2014 U.S. Dist. LEXIS 177472 at *22 (citing *Johnson*, 488 F.2d at 717-19). "'[N]ot every [*Johnson*] factor need be necessarily considered', however." *Id.* at *22-23 (recognizing that not all

of the *Johnson* factors are applicable in a common fund situation) (citations omitted).

Regarding the time and effort required of Plaintiffs' counsel (factors 1, 7, and 11), Plaintiff Phillips retained Plaintiffs' counsel in this matter in February 2023, and lengthy negotiations took place with Defendants' counsel regarding tolling, an exchange of informal discovery and information relevant to the EPA claims alleged, and other relevant matters to ensure the Parties were sufficiently informed regarding the merits of the action prior to mediation. Appx. Exhibit A, Page 010-012, ¶¶ 16-18. Indeed, the Parties exchanged substantial discovery prior to attending mediation with Dina Jansenson in order to determine the range of potential liability and EPA damages. *Id.* This represents a significant devotion of time to reach resolution of this case. To date, Plaintiffs' counsel have expended 298.45 hours on this action, with a total lodestar of $209,113.51. Appx. Exhibit A, Page 016-017, 073-084, ¶ 26, Ex. 2. "When using the lodestar method, courts typically apply multipliers ranging from one to four." *In re Harrah's Entertainment*, 1998 U.S. Dist. LEXIS 18774 at *14-15 ("In contingency fee cases, this multiplier is necessary to reflect the possibility of no recovery.") (citation omitted).

Regarding the second and tenth factors, Plaintiffs refer the Court to Section V.A, *supra*, which details the many factual and legal obstacles to prevailing on the merits, and which demonstrates the novelty and difficulty of the questions posed and the "undesirability" of the case.

As to the third and ninth factors, Plaintiffs' counsel have zealously and competently represented Plaintiffs' and Potential Ameristeel EPA Collective Action Members' interests and have extensive experience litigating complex employment and civil rights class and collective actions, including sex discrimination cases. *See* Appx. Exhibit A, Pages 001-009, ¶¶ 3-14. Plaintiffs' counsel have done substantial work identifying, investigating, prosecuting, and settling the collective claims here. *Id.* Pages 011-013, ¶¶ 17-19. They have substantial experience

prosecuting and settling employment class, collective, and individual actions, including sex discrimination cases, and courts have repeatedly appointed Plaintiffs' Counsel to be class counsel in employment and civil rights class actions. *Id.* Pages 001-013, ¶¶ 3-19. Further, Plaintiffs' counsel's acceptance of this case (factor 4), and the considerable time and effort expended on this case, has precluded time that they could have spent pursuing other matters.

Regarding the fifth and twelfth factors, as noted, it is "not unusual" for Fifth Circuit district courts to award percentages of "approximately one third" for attorneys' fees involving a common fund. *In re Harrah's Entm't*, 1998 U.S. Dist. LEXIS 18774 at *11. As to the sixth factor, Plaintiffs' counsel took this case on a contingency fee basis, which means Plaintiffs' counsel "has taken on greater risk than if [they] had taken the case on a fixed hourly fee." *Jones*, 2014 U.S. Dist. LEXIS 177472 at *24 ("The contingent nature of the fee favors an increase in the typical benchmark percentage.") (citing *Klein*, 705 F. Supp. 2d at 678).

Finally, "the most critical factor in determining a fee award is the degree of success obtained" (factor 8). *Singer v. City of Waco*, 324 F.3d 813, 829 (5th Cir. 2003) (citation omitted). The degree of success here is high because Defendants vigorously contested Plaintiffs' and the Potential Ameristeel EPA Collective Action Members' claims and denied that they were underpaid, or that any alleged damages are owed. Here, each male who fathered a child during the Ameristeel EPA Covered Period is eligible to opt-in to the Settlement and to be paid a substantial Individual Settlement Payment. Since attorneys' fees, litigation costs, Plaintiffs' General Release Payments, and all actual claims administration costs shall be paid by Defendants on top of and in addition to the Individual Settlement Payments, only the employee-side tax withholdings and deductions on the W-2 portion of Individual Settlement Payments will be taken out of each Participating Ameristeel EPA Opt-In Member's Individual Settlement Payments. *Id.* Settlement,

¶¶ 10, 40(a).

While Defendants deny that Potential Ameristeel EPA Collective Action Members' purported injuries are wage claims, and asserts instead that any potential injury is for the intangible loss of baby bonding time, the Individual Settlement Payment structure was negotiated by the Parties to account for the fact that Defendants changed their parental leave policy beginning January 1, 2023 and provided employees with a one-year "look back" period which allowed employees who had children in 2022 to take paid parental leave in 2023. Appx. Exhibit A, Page 012-013, ¶ 19. The potential payment amounts to Participating Ameristeel EPA Collective Action Members (i.e., $6,000, $3,000, or $1,000, as described herein) are fair and a significant recovery, especially considering each Potential Ameristeel EPA Collective Action Members' possible recovery through this action was limited to, at most, damages stemming from potential wages owed for six-weeks of unpaid parental leave time. In essence, "Plaintiffs' counsel was able to bring an earlier settlement of the case, allowing a cash award to Plaintiffs [and Potential Ameristeel EPA Collective Action Members] without the risk of drawn-out litigation." *Jones*, 2014 U.S. Dist. LEXIS 177472 at *25.

Finally, in addition to the monetary relief provided to Plaintiffs and Participating Ameristeel EPA Opt-In Members, Ameristeel modified the maternity leave policy at issue in this dispute effective January 1, 2023 to remove gender as a condition of being allowed to take paid parental leave following the birth of a child. Settlement, ¶ 69. Accordingly, numerous employees and their families, including Potential Ameristeel EPA Collective Action Members, will benefit from this prospective relief in the future. Appx. Exhibit A, Page 015, ¶ 22.

### D.  __The General Release Payments to the Named Plaintiffs are Fair and Reasonable__

The requested General Release Payments to the two named Plaintiffs of $10,000 each (i.e.,

$20,000 total) are also fair and reasonable. As an initial matter, "Courts approve service awards for named plaintiffs and class representatives insofar as they are reasonable." *Shaw v. CAS, Inc.*, 2018 U.S. Dist. LEXIS 136394, at *12 (S.D. Tex. Jan. 21, 2018). However, the Settlement at issue in the immediate case—as well as the corresponding General Release Payments—is not a typical class or collective action settlements for at least two reasons.

First, while most class or collective action settlements result in a single, set gross settlement amount to be used to fund payment of both fixed costs (e.g., attorneys' fees, litigation costs, settlement administration costs, class representative service awards), and individual settlement payments to class or collective members, here, the Settlement's Gross Settlement Amount is presently unknown but will consist of either $6,000, $3,000, or $1,000 payments to each Participating Ameristeel EPA Opt-In Member, with no deductions for fixed costs, **all** of which (i.e., attorneys' fees, litigation costs, claims administration costs, and the Plaintiffs' General Release Payments) are to be paid by Defendants on top of and in addition to each Individual Settlement Payment. See Section III.C, *supra*. Accordingly, Plaintiffs' General Release Payments will not dilute the Individual Settlement Payments of Participating Ameristeel EPA Opt-In Members. *Id.*

Second, while service awards are generally awarded to named plaintiffs in consideration of the time, effort, and risk they undertook in initiating the action and being the named plaintiff and class or collective representative (*Lee*, 2015 U.S. Dist. LEXIS 194001 at *9-13), here, Plaintiffs' General Release Payments of $10,000 each are explicitly in consideration for their agreement to not only release the claims alleged in this action—which all Participating Ameristeel EPA Opt-In Members are agreeing to release (see Settlement, ¶ 61), but Plaintiffs have also agreed to a broader, global general release of liability and waiver of claims. *See id.* at ¶ 60 ("Plaintiffs

each agree to execute separate settlement agreements, including a full general release of any claims

he may have, whether known or unknown, without exception, except as may be prohibited by law,

against [Ameristeel], through and including the date the general release is signed. The general

release of claims to be signed by Plaintiffs will include other standard non-monetary terms such

as…non-disparagement provisions….").

While courts in the Fifth Circuit have held that "[g]eneral releases within an FLSA

settlement as to collective action members are not acceptable as 'this kind of general release

absolves the employer of potential liability unrelated to the employee's FLSA claim[,]'" they have

also recognized that "courts have approved of settlement agreements under the FLSA where a

general release outside the scope of wage and hour claims are included as to the *named* plaintiff

only." *Jasso*, 2022 U.S. Dist. LEXIS 207043 at *14-15 (citations omitted) (emphasis in original).

*See also D'Angelo v. Hunter Bus. Sch., Inc.*, 2023 U.S. Dist. LEXIS 12344, at *1, 6-7, 42-43

(E.D.N.Y Jan. 24, 2023) (granting preliminary approval and conditional approval as a collective

action to an FLSA wage-and-hour settlement where the Settlement Fund includes both a $10,000

"service award" and a separate $15,000 "general release payment" to the named Plaintiff);

*Guerrero v. United States Gypsum Co.*, 2022 U.S. Dist. LEXIS 233930, at *23 (S.D. Cal. Dec. 30,

2022) (approving a $5,000 "Service Award" and a separate $10,000 "General Release Payment"

to the named Plaintiff, and finding both payments warranted and reasonable).

While Plaintiffs maintain that their proposed $10,000 General Release Payments, which

are not deducted from the common fund since they are paid on top of and in addition to all

Individual Settlement Payments, are not service awards in the traditional class or collective action

sense, Plaintiffs' proposed General Release Payments are still fair and reasonable even if,

*arguendo*, they are considered service awards.

This Court has recognized that "[a]n additional service award is not uncommon in class action litigation and particularly where…a common fund has been created for the benefit of the entire class. The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Jones*, 2014 U.S. Dist. LEXIS 177472 at n.7 (citations and internal quotations omitted). In determining whether a service award is fair and reasonable, courts can consider several factors, including the financial and other risks the plaintiff took in commencing the suit, the "amount of time and effort spent[,]" the "actions the plaintiff[s] took to protect the interests of the class[,]" the "degree to which the class benefitted from those actions[,]" and "to compensate them for activities including participation in the settlement process…." *Lee*, 2015 U.S. Dist. LEXIS 194001 at *9-11.

Here, Plaintiffs request, and Ameristeel does not oppose, General Release Payments that are on top of and in addition to all Individual Settlement Payments to Participating Ameristeel EPA Opt-In Members in the amount of $10,000 each, in addition to the payments they are otherwise entitled to receive as Participating Ameristeel EPA Opt-In Members. The proposed General Release Payments are reasonable given the time and effort that the named Plaintiffs devoted to this case, the valuable assistance they provided to their counsel, and the fact that they entered into a general release of claims that is broader than the release of the Participating Ameristeel EPA Opt-In Members. Appx. Exhibit B, Page 098, ¶¶ 7-8; Appx. Exhibit C, Pages 102-103, ¶¶ 7-8. Indeed, Plaintiffs initiated this action to represent the Potential Ameristeel EPA Collective Action Members when no other employees were willing to do so. Plaintiffs assumed significant risk in bringing this litigation—namely, had they lost, they could have been ordered to pay Ameristeel's costs. *Id.* Plaintiffs provided invaluable assistance to their counsel and the

40

Potential Ameristeel EPA Collective Action Members in this case, including providing factual background for settlement discussions and the Complaint; participating in several lengthy interviews and phone conferences over several months to discuss litigation and settlement strategy; speaking with other Potential Ameristeel EPA Collective Action Members about their experiences working for Ameristeel; reviewing the Complaint and other documents; providing documents about Ameristeel's parental leave policies and practices; attending and actively participating in the October 10, 2023 all-day mediation; and reviewing the settlement documents and this Motion. *Id.* This case also involved risks for Plaintiffs, including reputational and retaliation risks. *Id.* Plaintiffs agreed to undertake the financial and reputational risk of serving as named Plaintiffs and exposed themselves to the risk of negative publicity or retaliation by anyone who opposed this case. *Id.* Regardless of these risks, Plaintiffs pursued this case on behalf of the Potential Ameristeel EPA Collective Action Members to a successful resolution and settlement and agreed to participate in this case with no guarantee of personal benefit. *Id.*

Finally, courts in the Fifth Circuit and elsewhere have approved similar, or larger, service awards than the General Release Payments proposed here. *See Guadalupe v. Am. Campus Communities Services, Inc.*, 2020 U.S. Dist. LEXIS 259660, at *6-7 (W.D. Tex. Oct. 23, 2020) (approved service award of $12,000 in FLSA collective action); *Izzio v. Century Golf Partners Management*, 2019 U.S. Dist. LEXIS 226946, at *34-35 (N.D. Tex. Feb. 13, 2019) (approving incentive awards totaling $39,000, including a $10,000 service award to a named plaintiff); *Welsh v. Navy Fed. Credit Union*, 2018 U.S. Dist. LEXIS 227456, at *44-45 (W.D. Tex. Aug. 20, 2018) (approving an incentive award of $10,000 to the named Plaintiff); *Lea v. Baker Hughes, Inc.*, 2015 U.S. Dist. LEXIS 183797, at *8 (S.D. Tex. Aug. 4, 2015) (approving an incentive award of $10,000 to the named plaintiff and class representative); *Shaw v. CAS, Inc.*, 2018 U.S. Dist. LEXIS 136394,

at *12-13 (S.D. Tex. Jan. 31, 2018) (approving service awards in the amount of $10,000 for the named plaintiffs); *Camp v. Progressive Corp.*, 2004 U.S. Dist. LEXIS 19172, at *23-24 (E.D. La. Sept. 23, 2004) (awarding up to $10,000 incentive payments to class representatives); *Duncan v. JPMorgan Chase Bank, N.A.*, 2016 U.S. Dist. LEXIS 122663, at *50-51 (W.D. Tex. May 24, 2016) (granting $10,000 service award and noting that "District courts in the Fifth Circuit routinely award $5,000-$10,000 per named plaintiff."); *Shaw v. Toshiba Am. Info. Sys., Inc*., 91 F. Supp. 2d 942, 973 (E.D. Tex. 2000) (approving $25,000 incentive awards to both named plaintiffs); *In re Catfish Antitrust Litig*., 939 F. Supp. 493, 504 (N.D. Miss. 1996) (approving $10,000 incentive awards to each of the four named plaintiffs); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 449 (S.D. Tex. 1999) (approving awards of up to $10,000 per class representative); *Klein*, 705 F. Supp. 2d at 682 (approving "payments of $75,000 each for the two class representatives…for their services to the class as a whole."); *Bryant v. United Furniture Indus.*, 2017 U.S. Dist. LEXIS 22280, at *113-14 (N.D. Miss. Feb. 16, 2017) (approving incentive awards to the named plaintiff class representatives, including two $10,000 incentive awards who "thoroughly assisted Class Counsel and staff throughout the suit and settlement conferences").

Accordingly, because Plaintiffs took significant personal risks in representing the interests of the Potential Ameristeel EPA Collective Action Members, worked diligently to ensure the Potential Ameristeel EPA Collective Action Members could recover the wages they are allegedly due, including through pre-mediation assistance and attendance at the all-day mediation session, and agreed to provide Ameristeel with a general release of claims in addition to releasing their FLSA claims, Plaintiffs respectfully request that the Court approve the Parties' agreed General Release Payments as fair and reasonable.

///

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion

and enter the Proposed Order.


Dated: April 12, 2024

/s/ Craig J. Ackermann
Craig J. Ackermann, Esq.
Brian W. Denlinger, Esq.
ACKERMANN & TILAJEF, P.C.
315 S. Beverly Drive, Suite 504
Beverly Hills, CA 90212
Telephone: (310) 277-0614
E-mail: cja@ackermanntilajef.com
     bd@ackermanntilajef.com

Matthew J. Clark, Esq.
Gregory, Moore, Brooks & Clark, P.C.
28 W. Adams Ave., Suite 300
Detroit, MI 48226
(313) 964-5600
Email: matt@unionlaw.net

Cheryl Legare, Esq.
Legare, Attwood & Wolfe, LLC
125 Clairemont Ave., Ste. 380
Decatur, Georgia 30030
Email: cblegare@law-llc.com

*Attorneys for Plaintiffs*